UNITED STATES DISTRICT COURT
EASTERN DIVISION OF MISSOURI
EASTERN DIVISION

LORILEE E. BAUMER,                    )
                                      )
        Plaintiff,                    )
                                      )    No.  4:05CV02169 JCH
                                      )                   (FRB)
                                      )
v.                                    )
                                      )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,[1]   )
                                      )
        Defendant.                    )

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural Background**

Plaintiff filed an application for Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., on August 26, 2003, alleging disability as of September 1, 2001 due to diabetes, asthma, and vision loss. (Tr. 53-55.) Plaintiff's

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon, and former Commissioner Jo Anne B. Barnhart, as defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

application was initially denied on October 2, 2003, and plaintiff filed a request for a hearing on December 5, 2003. (Tr. 39-43; 38.) On January 19, 2005, a hearing was held before administrative law judge ("ALJ"), wherein plaintiff was represented by attorney Elizabeth Holt. (Tr. 206-28.) On April 24, 2005, the ALJ issued his decision that plaintiff was not under a disability as defined by the Act at any time through the date of his decision. (Tr. 13-20.)

On June 22, 2005, plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council. (Tr. 9-9A.) Plaintiff submitted additional medical information to the Appeals Council, and specifically: a list of antibiotics plaintiff took from March 1, 2001 through February 8, 2005; a financial history from Dr. Fishman's office spanning May 13, 2002 through May 9, 2005; a May 18, 2005 office note and a May 19, 2005 letter from Dr. Fivian; records from Dr. Potts dated March 6, 2001 through May 20, 2005; and a letter from Dr. Fishman dated May 27, 2005. (Tr. 7-8; 13; 181-85; 188-92; 193-205.) The Appeals Council reviewed the additional medical information and denied plaintiff's request for review on September 16, 2005, stating that the additional records included no objective findings that provided a basis for changing the ALJ's decision. (Tr. 3-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence before the ALJ

### A.  Testimony of Plaintiff

At the hearing on January 19, 2005, plaintiff responded to questions from counsel and the ALJ.  In response to questioning from her attorney, plaintiff testified that she was born on October 12, 1960, was not married, and had two fifteen-year-old children. (Tr. 209.)  She completed four years of college, and has an associate of arts degree. (Tr. 210.) Her work background included work as a babysitter and a nanny. (Tr. 210-11.)

Plaintiff testified that she was diagnosed with Type 1 diabetes at the age of five, and currently receives treatment from Dr. Norman J. Fishman. (Tr. 215.)  She takes Humalog (insulin), and has used an insulin pump for the past 22 years.  Id.  Plaintiff testified that her blood sugar is prone to sudden increases and decreases, and stated that she is required to check her blood sugar ten times per day. (Tr. 215-16.)

Plaintiff testified that she had diabetic retinopathy in 1979 and underwent laser treatment which was successful. (Tr. 216.)  Plaintiff testified that her vision has gradually diminished since 2001, and attributed this to a "mini stroke or a TIA" which damaged blood vessels in her eyes. (Tr. 217.)  Plaintiff testified that she has suffered from asthma since 1982 and that this condition has worsened since a bout with pneumonia. (Tr. 218.) Plaintiff testified that she sees a Dr. Potts for this condition,

-3-

and that he treats her with cortisone and antibiotics. <u>Id.</u>
Plaintiff testified that she had not been hospitalized since 2001.
<u>Id.</u>

Regarding her daily activities, plaintiff testified that
she requires help from church friends and her two children to keep
her home clean. (Tr. 219.) Plaintiff does cook, and she home-
schools her children. <u>Id.</u> Plaintiff has not driven a car since an
incident during which she was driving and suffered a sudden loss of
vision. (Tr. 219-220.) Plaintiff testified that, although she has
20/20 vision while wearing her glasses, her field of vision has
diminished. (Tr. 220.) Plaintiff testified that her left eye is
more greatly affected, but did not know what percentage of her
field of vision she had lost. (Tr. 220-21.)

Plaintiff then responded to a series of questions from
the ALJ. Plaintiff testified that she had personally typed a
letter to a Dr. Pizoni, and that she reviews her children's
homework. (Tr. 221.) Plaintiff testified that she uses a computer
to "blow up" the children's work so that she can see it. <u>Id.</u>
Plaintiff testified that she shops for groceries, but takes a taxi
cab and is accompanied by her children. (Tr. 221-22.) Plaintiff
does her own laundry and also takes her children shopping for
clothing and other essentials. (Tr. 222.)

Plaintiff testified that she was not taking any
medication for depression or anxiety. <u>Id.</u> Plaintiff testified
that she sees a therapist named Dr. Onken every two weeks for post-

-4-

traumatic stress disorder. Id. Plaintiff last saw a physician for her eyes in March of the preceding year. Id. Plaintiff testified that she is not receiving treatment from any other physicians. (Tr. 223.)

Plaintiff last drove in 2001, and sold her car in 2002. Id. Plaintiff routinely takes the bus. Id. When the ALJ asked plaintiff where she went on the bus, plaintiff testified as follows: "I go to my doctors, my -- I have a friend who has some severe problems and I take him to his doctor appointments, orthodontist, dentist. If I go shopping for clothes, we take the bus." Id.

When asked to describe a typical day, plaintiff testified that on a day she rides the bus, she leaves her home with her two sons, boards the bus, and attends her appointments until about noon or 1:00. (Tr. 223-24.) Plaintiff and her sons then eat lunch, during which they discuss the children's schoolwork, and plaintiff offers them advice on their various school projects. (Tr. 224.) Following lunch, plaintiff and the children board the bus, and arrive home two to three hours later. Id. Plaintiff also travels "right down the street" to check her post office box. Id.

Plaintiff testified that, on a day she does not ride the bus, she attempts to cook extra meals because, on the days she rides the bus, she is too tired to cook. Id. Plaintiff testified that she does housework. (Tr. 225.) Plaintiff also does paperwork in conjunction with suing her former husband for almost $13,000.00

in child support arrearage.  Id.  Plaintiff further testified that she is attempting to write stories, and that she spends some time writing down ideas.  Id.  Plaintiff testified that she eats lunch at noon, and then takes her sons to the gymnasium located in the apartment complex.  Id.  Plaintiff is active in a weekly Bible study group, and attends church every Sunday.  (Tr. 225.) Following the hearing, the ALJ closed the record. (Tr. 226.)

B.  Medical Records

The record indicates that, on February 14, 2001, plaintiff was admitted to St. Luke's Hospital by Dr. Norman Fishman, M.D.  (Tr. 123-24.)  Upon physical exam, Dr. Fishman noted that plaintiff was in no apparent distress except for an intermittent non-productive cough, and further noted the absence of edema.  (Tr. 124.)  Plaintiff was diagnosed with right middle-lobe pneumonia, and was administered Levaquin[2] per IV.  (Tr. 125.)  The record further indicates that Dr. Fishman noted plaintiff's history as including mild, untreated asthma with Albuterol use as needed, a history of post-infectious bronchitis, diabetes, nausea and vomiting, and fever.  (Tr. 126, 132.)  It was noted that plaintiff was taking insulin, and was also taking the over-the-counter medications Benadryl and Tylenol.  (Tr. 132.)

Upon exam, Dr. Fishman noted that plaintiff was alert and

_____

[2]Levaquin is used to treat infections such as pneumonia and chronic bronchitis.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697040.html

pleasant, and in no apparent distress with the exception of an intermittent, non-productive cough. (Tr. 124.) Chest x-rays revealed pneumonia in the lateral right segment of plaintiff's lung. (Tr. 140.) Plaintiff was discharged on February 17, 2001 with prescriptions for Levaquin, Serevent,[3] and Proventil,[4] and instructed to follow-up with Dr. Fishman. (Tr. 136.)

On March 6, 2001, plaintiff was seen in follow-up by Dr. Daniel E. Potts, M.D., a cardio-pulmonary specialist who had a consulting role during plaintiff's hospitalization at St. Luke's Hospital. (Tr. 204.) Dr. Potts noted plaintiff's history of pneumonia and sinusitis, noting that plaintiff had "relapsed last week" and had resumed taking Levaquin per Dr. Fishman. Id. Upon exam, Dr. Potts noted no polyps, rales, rhonchi, edema or clubbing. Id. Dr. Potts' impression was that plaintiff was improving, and he continued her on Serevent and Levaquin. Id. Plaintiff next saw Dr. Potts on April 6, 2001, with complaints of continued cough. (Tr. 203.) X-rays taken on this date revealed that plaintiff's pneumonia had resolved. (Tr. 120.) Upon exam, Dr. Potts noted no rales or rhonchi, and diagnosed plaintiff with resolved pneumonia and cough. Id. Plaintiff returned to Dr. Potts on May 20, 2001.

---

[3]Serevent is used to treat wheezing, shortness of breath and breathing difficulties caused by asthma and chronic obstructive pulmonary disease. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695001.html

[4]Proventil, or Albuterol, is used to prevent and treat wheezing, shortness of breath, and troubled breathing caused by asthma and other breathing difficulties. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682145.html

(Tr. 202.) Plaintiff reported no asthma problems and indicated that she had ceased using her inhaler. Id. Plaintiff exhibited no cough or wheezing. Id. Again, Dr. Potts noted no wheezing, rales or rhonchi. Id.

Plaintiff saw Dr. Potts again on September 13, 2001 and reported a recent episode of asthma and wheezing which had responded to medication. (Tr. 201.) Upon exam, Dr. Potts noted no rales, rhonchi or wheezing, and further noted no edema or clubbing. Id.

Records which are apparently those of Dr. Fishman indicate that plaintiff was seen on February 11, 2002 for treatment related to diabetes. (Tr. 172-74.) The record further indicates that plaintiff returned to Dr. Potts on May 8, 2002, and that Dr. Potts noted that plaintiff was "doing quite well" and that she was using an inhaler as needed. (Tr. 200.) Upon exam, Dr. Potts noted no rales, rhonchi or wheezing, and no edema. Id.

Records which are apparently those of Dr. Gerald J. Fivian, M.D., indicate that plaintiff was seen on August 1, 2002 with complaints of decreased visual field and a resulting inability to drive. (Tr. 152, 190.) Plaintiff described this as a "black hole" in her field of vision which disappeared upon closing her eyes. (Tr. 152.) It was noted that plaintiff was taking Combivent[5]

_____

[5]Combivent is used to prevent and treat wheezing, shortness of breath, and troubled breathing caused by asthma and other breathing difficulties. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682145.html

and Astelin.[6]  Id.  Dr. Fivian diagnosed plaintiff with visual
field loss.  Id.

Plaintiff returned to Dr. Fishman on May 13, 2002. (Tr.
168.)  Dr. Fishman's notes indicate that plaintiff was treating
with insulin, and further indicate no unusual findings upon exam.
Id.

On September 9, 2002, plaintiff underwent an MRI of her
brain, and MRI examination of the cervical and intracranial
circulations. (Tr. 119.)  A history of visual loss is noted.  Id.
The impression was "multiple non-specific foci of increased signal
intensity on flair images in the white matter of the cerebral
hemispheres which may be seen in the setting of demyelinating
disease, small vessel disease, or chronic migraine."  Id.  Thirty
to 40% stenosis was noted in the left internal carotid artery, and
25% stenosis in the right internal carotid artery.  Id.  No major
intracranial stenosis were noted. (Tr. 119.)

Plaintiff saw Dr. Fishman again on October 25, 2002, and
it was noted that she had a sinus infection with a low-grade
temperature. (Tr. 164.)

Plaintiff returned to Dr. Fivian on December 10, 2002 and
reported she was still having the same problems related to visual
field loss. (Tr. 151.)  Dr. Fivian noted his impression as stable

_____

[6]Astelin is used to treat the symptoms of sneezing, runny nose and
itching associated with seasonal allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203484.html

suspected retinal infarction.  Id.  It is noted that plaintiff was taking Advair, Cortizone, Combivent, and insulin.  Id.

On January 20, 2003, plaintiff presented to the emergency room at St. Luke's Hospital with complaints related to an infected right index finger.  (Tr. 113-14.)  Plaintiff was diagnosed with mild cellulitis of the right index finger and prescribed Keflex.[7]

On January 28, 2003, plaintiff saw Dr. Fishman, who examined her finger, and continued plaintiff on her current insulin therapy.  (Tr. 162.)  On June 21, 2003, plaintiff saw Dr. Fishman with complaints of allergies and shortness of breath while outside. (Tr. 158.)  Plaintiff stated that she was unable to drive due to poor vision.  Id.  Dr. Fishman's office note indicates that plaintiff was no longer having trouble with low blood sugar.  Id. Dr. Fishman further noted that plaintiff was not working and had applied for disability and medicare.  Id.

The record contains a June 25, 2003 note from Dr. Fivian's office indicating that a Dr. Joe Dooley telephoned Dr. Fivian's office regarding the nature of plaintiff's diagnosis. (Tr. 150.)  Dr. Dooley apparently indicated that plaintiff had left a "nasty" message on his voice recorder in which she stated that Dr. Fivian told her she had suffered a stroke, but that Dr. Dooley had told her she had diabetic retinopathy and narrowing of the blood vessels of the eye, for which she required medication.  Id.

---

[7]Keflex is a cephalosporin antibiotic used to treat infections caused by bacteria.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682733.html

Dr. Fivian's office note indicates his opinion that plaintiff had symptomatic change in her visual field, and that the retinal vessels were very attenuated. Id.

Dr. Fivian's records further indicate that plaintiff was seen on June 26, 2003 for follow-up, and reported that her blood sugar had been "pretty good recently." (Tr. 149.) Plaintiff did report continued difficulty with her peripheral vision, and stated that she was still unable to drive. Id. Dr. Fivian noted that plaintiff had significant visual field loss on the left, and made the following assessment: 2° to retinal vascular occlusive disease and 2° to plaintiff's diabetes. (Tr. 147.) Dr. Fivian indicated that plaintiff's vision was corrected to 20/25+3 on the right, and 20/30 on the left. Id.

The record indicates that plaintiff received bi-monthly treatment for panic attacks and post-traumatic stress disorder from Psychologist Deborah S. Onken, Ph.D., of the Family Synthesis Institute, from July 23, 2002 through September 9, 2003. (Tr. 176.) The record does not contain individual treatment notes, but does contain two letters and what appears to be somewhat of a functional assessment form from Dr. Onken. (Tr. 175-77; 179.)

On September 9, 2003, Dr. Fivian completed a functional capacity form indicating plaintiff's visual acuity as 20/25+3 on the right, and 20/30 on the left. (Tr. 147.) Dr. Fivian opined that plaintiff had significant visual field constriction and significant visual field loss on the left, which was likely due to

retinal vascular occlusive disease and plaintiff's diabetes.  Id.

On September 22, 2003, in a form soliciting information regarding plaintiff's functional capacity, Dr. Onken referenced her treatment of plaintiff for panic attacks and post-traumatic stress disorder, and stated that plaintiff was neat in her appearance and exhibited appropriate behavior.  (Tr. 176.)  Dr. Onken left blank the section of the form soliciting information about "any evidence of a mental problem which impacts the patient's ability to perform basic tasks and make decisions required for daily living," and further left blank the sections asking her to describe plaintiff's functional limitations related to deficiencies of concentration, persistence or pace, and repeated episodes of deterioration in a work-like setting.  (Tr. 176-77.)

Dr. Onken indicated that plaintiff tended to intellectualize and normalize the inappropriate and abusive behavior of others, including her father and ex-husband.  Id.  When asked to describe plaintiff's functional limitations, Dr. Onken indicated that plaintiff was unable to drive, had decreased vision, and was limited in her ability to walk due to asthma.  Id.  Dr. Onken indicated that plaintiff had no difficulties in maintaining social functioning.  (Tr. 176.)

In a letter dated September 24, 2003, Dr. Onken indicated that plaintiff suffered from depression "due to lack of money and a very insecure future."  (Tr. 175.)  Dr. Onken further noted plaintiff's history of insulin-dependent diabetes, pneumonia and

asthma, but noted that plaintiff had to "keep going" for the sake of her twin boys, one of whom was under psychiatric care for major depression and ADHD. Id. Dr. Onken further indicated plaintiff's history of abuse at the hands of her husband, whom plaintiff divorced, and further noted a history of a black mold in the basement of the home she had shared with her husband, which worsened her lung condition. Id. Dr. Onken further indicated her diagnosis of plaintiff as post-traumatic stress disorder, generalized anxiety disorder with panic attacks, and stress caused by her fragile health and difficult living conditions. Id.

On October 20, 2003, plaintiff was seen by Dr. Potts with complaints of a sinus infection and cough. (Tr. 199.) Dr. Potts noted that plaintiff was suffering a mild exacerbation. Id. In a letter dated June 21, 2004, Dr. Potts noted that plaintiff had been under his care for asthma and sinusitis since her 2001 admission to St. Luke's Hospital for pneumonia, and stated that plaintiff required periodic follow-up in his office due to episodes of acute bronchitis and intermittent sinusitis. (Tr. 196.) Dr. Potts noted that plaintiff should be seen on a six-month periodic basis, and should also be seen upon the onset of acute exacerbations of her condition. Id.

Plaintiff returned to Dr. Potts on November 19, 2004 with complaints of cough and wheezing. (Tr. 195.) Upon exam, Dr. Potts

noted edema in plaintiff's extremities, and prescribed Prednisone[8] and Advair.[9] <u>Id.</u> On May 20, 2005, plaintiff saw Dr. Potts with complaints of an exacerbation which had been stabilized with Advair. (Tr. 194.) Dr. Potts recommended that plaintiff refill her Advair prescription, and apparently prescribed an antibiotic. <u>Id.</u>

In a letter dated May 19, 2005, Dr. Fivian summarized his treatment of plaintiff. (Tr. 188.) Therein, Dr. Fivian indicated that plaintiff had undergone extensive laser photocoagulation treatment of each eye in 1981 and 1982, which successfully arrested the progression of her diabetic retinopathy, but resulted in decreased focusing power in each eye, decreased peripheral vision, and decreased night vision. (Tr. 188.) Dr. Fivian noted that, in August 2002, plaintiff reported a sudden onset of significant visual change in her left eye, and that examination had revealed retinal vascular occlusion, an event Dr. Fivian analogized to a "stroke" in the retina "resulting in significant, profound and permanent decrease in her visual field that precludes her from driving and has made it very risky for her to attempt to cross major streets to access public transportation." <u>Id.</u> Dr. Fivian

---

[8]Prednisone, a corticosteroid, is used to treat low levels of corticosteroids by replacing steroids that are normally produced by the body, and is also used to treat other conditions by reducing swelling and inflammation.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

[9]Advair is used to prevent and treat wheezing, shortness of breath, and troubled breathing caused by asthma and other breathing difficulties.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html

noted that plaintiff had marked narrowing of all of the retinal vessels in each eye. Id. Dr. Fivian noted that, during his most recent exam on May 18, 2005, plaintiff exhibited visual acuity of 20.30 in each eye, with intraocular pressures recorded at the upper end of the normal range and minimal cataract formation. Id.

On May 19, 2005, in a letter solicited by plaintiff's attorney, Dr. Fivian noted that he had seen plaintiff on May 18, 2005 for repeat ophthalmological evaluation related to her application for disability benefits. (Tr. 188-89.) Dr. Fivian noted that visual field testing revealed severe constriction of the visual fields, more prominent in the left eye, a finding essentially unchanged from those observed at the time of her "retinal stroke" in August 2002 and the subsequent field in June 2003. (Tr. 189.) Dr. Fivian opined that these visual field changes had been particularly disabling to plaintiff because they have caused her to suffer extreme difficulty visualizing objects on the floor, such as steps and curbs, and further opined that plaintiff was precluded from her past work in a daycare center due to the possibility that she may step on a child. Id. Dr. Fivian concluded that plaintiff's visual efficiency loss on the basis of visual acuity was 12% per eye, and that her retained field of vision efficiency is 25% on the right and 12% on the left. Id. Dr. Fivian further opined that these defects were permanent. Id.

Finally, in a letter dated February 12, 2005, Dr. Onken repeated many of her opinions contained in her September 24, 2003

letter. (Tr. 179.) Dr. Onken again opined that plaintiff suffered from post-traumatic stress syndrome and depression due to having been abused and forced to live in a shelter for five months. Id. Dr. Onken further indicated that plaintiff suffered from an unstable financial situation, and was burdened by high medical and transportation bills. Id.

In a letter dated May 27, 2005, Dr. Fishman indicated that he had been treating plaintiff for Type 1 diabetes since 1979, and that her condition required her to use an insulin pump as opposed to multiple shot therapy. (Tr. 205.) Dr. Fishman indicated that plaintiff's condition requires her to test her blood sugar many times per day and adjust her activity significantly if her blood sugar level is unstable. Id. Dr. Fishman further opined that plaintiff's blood sugars are frequently out of control due to repeated bouts of pneumonia caused by asthma and the need for cortisone to control that condition. Id. Dr. Fishman noted that, before February 2001, plaintiff appeared to have no problems maintaining a busy schedule and high level of activity. Id. Dr. Fishman concluded that he believed plaintiff's current poor health condition would remain unchanged. (Tr. 205.)

III.    **The ALJ's Findings**

The ALJ found that the medical evidence established that plaintiff suffered from diabetes mellitus and low peripheral vision (greater in the left eye), and that, although such impairments were

-16-

"severe" as defined by Social Security Ruling 85-28, they were not of listing-level severity. (Tr. 13-14; 18.) The ALJ found that plaintiff's allegations of disabling symptoms precluding all substantial gainful activity were not consistent with the evidence and were not credible. (Tr. 19.) The ALJ found that plaintiff had vocationally relevant work experience as an Amway dealer, nanny, daycare worker, and housekeeper. (Tr. 13.) The ALJ found that plaintiff was unable to perform her past relevant work, but that she retained the residual functional capacity ("RFC") to perform a full range of light work with the exception of work requiring good bilateral peripheral vision and/or the ability to lift over twenty pounds. (Tr. 19.) The ALJ found that plaintiff's visual acuity was sufficient for her to avoid workplace hazards and to handle and work with relatively small objects, provided she wore corrective lenses. Id. The ALJ found no other exertional or non-exertional limitations, citing 20 C.F.R. § 416.945. Id. The ALJ found that plaintiff was 44 years of age, which is defined as a younger individual, and that she had completed 16 years of education and, considering these factors along with plaintiff's residual functional capacity, the issue of whether plaintiff retained transferable skills was not critical, citing 20 C.F.R. § 416.968. Id. The ALJ concluded that, based upon plaintiff's residual functional capacity, age, education and work experience, she was not disabled, and was not under a disability as defined in the Social Security Act and Regulations, citing 20 C.F.R. § 416.920(g).

(Tr. 19.)

In making the above findings, the ALJ noted plaintiff's significant daily activities, including cooking meals, shopping, laundry, home schooling her two children two to three hours per day, cleaning her home with help, typing letters and attending church services and Bible study twice per week. (Tr. 15.) The ALJ further noted that plaintiff had indicated in her application for benefits that she engaged in gardening (sometimes with help) including planting flowers such as roses, pansies, and bulbs. Id. The ALJ noted that plaintiff further indicated in her application that she washed dishes, went banking and to the post office, took her twin sons to doctor's appointments, and fed and watered two cats. (Tr. 15-16.) The ALJ found it significant that plaintiff home-schooled and otherwise cared for two teenaged children and frequently left her home for a variety of activities. (Tr. 16.) The ALJ found plaintiff's daily activities in general to be "more than minimal," and an indication that plaintiff had the mental and physical stamina and ability to concentrate and use her arms and legs more than she alleged she could. Id.

## IV.  Discussion

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health

& Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by considering the claimant's work activity.  If the claimant is engaged in substantial gainful activity, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is

equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and consulting physicians;

4.   The plaintiff's subjective complaints

relating to exertional and non-exertional
                    activities and impairments;

          5.        Any corroboration by third parties of the
                    plaintiff's impairments;

          6.        The testimony of vocational experts, when
                    required, which is based upon a proper
                    hypothetical question which sets forth
                    the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-
86 (8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85
(8th Cir. 1989).


          The Court must also consider any "evidence which fairly

detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d

1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.

However, where substantial evidence supports the Commissioner's

decision, the decision may not be reversed merely because

substantial evidence may support a different outcome. Briggs, 139

F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.

1992), citing Cruse, 867 F.2d at 1184.

          In the case at bar, plaintiff, proceeding pro se,

submitted both an initial brief and a supplemental brief in

response to defendant's answer. (Document Nos. 16-1 and 18.)  In

both pleadings, plaintiff argued that her impairments of diabetes,

visual field loss, fevers, infections, chronic cough and asthma

precluded her ability to work.  As noted, supra, additional

evidence was submitted to and considered by the Appeals Council.

In addition, with her initial brief, plaintiff submitted additional

medical evidence not presented at the administrative level, and

specifically,

> (1) a May 23, 2003 letter she wrote to a Dr. Dooley indicating distress upon learning Dr. Dooley had opined that plaintiff's vision loss was due to diabetic retinopathy;

> (2) a May 12, 2003 medical report from Dr. James E. Walentynowicz, M.D., an orthopedic surgeon, indicating an examination of her left knee and diagnosis of a possible meniscal tear and popliteal cyst;

> (3) a May 20, 2003 MRI of the left knee which indicated small joint effusion and evidence suggestive of marrow edema/bruising;

> (4) a May 23, 2003 letter from Dr. Fishman indicating that it may take six to eight weeks for plaintiff's knee to heal;  and

> (5) examination notes from Dr. Walentynowicz dated April 20, 2004, June 1, 2004 and July 9, 2004 diagnosing plaintiff with a fracture of the distal fibula in her left ankle, left shoulder adhesive capsulitis, and thoracic and lumbar back pain due to a recent fall for which plaintiff was advised to take Aleve and perform exercises, and radiological reports indicating negative findings relative to plaintiff's thoracic and lumbar spine.

> (Document No. 16-2, pages 2-12.)

Plaintiff appears to argue that remand is required for consideration of the foregoing medical evidence, arguing that the records of Dr. Walentynowicz are material to the instant cause because they support the conclusion that plaintiff tripped and broke her left ankle due to her vision loss.   In response, defendant argues that the ALJ's decision is supported by substantial evidence on the record as a whole.

A.    Disability and RFC Determination

As set forth, supra, the ALJ in this matter determined that plaintiff's impairments, although severe, were not of listing-level severity.  The ALJ further determined that plaintiff retained the residual functional capacity to perform  light work[10] that did not require bilateral peripheral vision and/or lifting over twenty pounds.  Plaintiff argues that her impairments preclude all work.

Residual functional capacity is what a claimant can do despite his limitations.  20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  An ALJ's RFC assessment which is

_____

[10]Light work involves the following activities: lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a good deal of walking or standing; or sitting most of the time with some pushing and pulling or arm or leg controls.  20 C.F.R. §§ 404.1576(b) and 416 967(b).

not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

It is well-settled law that an ALJ is required to fully and fairly develop the record. Nevland, 204 F.3d 853 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing. Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence. Id.

For his findings related to plaintiff's condition of diabetes, the ALJ noted that the medical evidence supported the conclusion that plaintiff's diabetes was controlled with insulin pump therapy. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir.

-24-

2001) (impairments controllable or amenable to treatment are incompatible with a finding of disability). The ALJ further noted that, although plaintiff had been diagnosed with diabetes, retinopathy and asthma, she sought no regular and sustained treatment for these conditions, other than bi-monthly counseling sessions with Dr. Onken. A lack of regular and sustained treatment is a basis for discounting complaints, and is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months. Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995); see also Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996); Barrett v. Shalala, 38 F.3d 1019, 1023-24 (8th Cir. 1994) (failure to seek medical treatment weighs against a finding of disability). The ALJ further noted the absence of any evidence that plaintiff ever required surgery or prolonged or repeated hospitalization. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment is inconsistent with allegations of disabling pain).

The ALJ also noted that no physician opined that plaintiff was totally disabled, and further noted that the medical records failed to document recurrent diabetic ketoacidosis, any history of diabetic coma, or any other diabetic complication such as significant weight loss, deep ulcer, end organ damage, cerebral vascular disease, coronary artery disease, congestive heart failure, neuropathy or peripheral vascular disease. See Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for ALJ

to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition). Furthermore, the undersigned notes that no physician imposed any significant physical restrictions upon plaintiff. <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported ALJ's decision denying benefits).

Regarding plaintiff's allegation of disability related to vision loss, the ALJ noted that the medical evidence of record documented that plaintiff's vision was correctable to 20/25 on the right and 20/30 on the left, and further noted that Dr. Fivian had opined that plaintiff's vision loss had stabilized. <u>Johnson</u>, 240 F.3d at 1148 (impairments controllable or amenable to treatment are incompatible with a finding of disability).

Regarding plaintiff's allegation of a disabling psychological impairment, the ALJ noted that, although plaintiff indeed sought counseling for anxiety symptoms from Dr. Onken, plaintiff took no psychiatric medication. The ALJ further noted that Dr. Onken had indicated that plaintiff was "okay" with regard to social functioning, and assigned no limitations of functioning to plaintiff as a result of mental health impairments. The ALJ concluded that a failure to take psychiatric medication or seek psychiatric treatment was a basis for discounting psychiatric complaints and was an indication that plaintiff's psychiatric symptoms were non-severe. <u>See Jones v. Callahan</u>, 122 F.3d 1148,

1153 (8th Cir. 1997) (holding substantial evidence supported ALJ's conclusion that claimant did not have severe mental impairment where claimant was not regularly taking psychiatric medications, and where claimant's daily activities were not restricted from emotional causes).

B.    Credibility Determination

Although the plaintiff herein does not directly challenge the ALJ's credibility determination, the undersigned will address this issue here, as the ALJ's credibility findings are crucial to his RFC determination.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321.    However, testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis
> which supports the degree of severity of
> subjective complaints alleged is just one
> factor to be considered in evaluating the
> credibility of the testimony and complaints.

The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he or she may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject . Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In this case, the ALJ specifically cited Polaski, and set forth numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. The ALJ

began by noting plaintiff's daily activities. Although daily activities alone do not disprove allegations of disability, they are a factor to consider in evaluating subjective complaints. Wilson, 76 F.3d at 241. Specifically, the ALJ noted plaintiff's testimony that she cooked meals, shopped, washed clothes, home schooled her two children two to three hours per day, cleaned her home with help from friends, typed letters, and attended church services and Bible study twice per week. The ALJ further noted that plaintiff indicated in her application that she washed dishes and gardened (at times with help), including planting flowers such as roses, pansies, or bulb plants. The ALJ noted that plaintiff went banking and to the post office, took her twin sons to doctor's appointments, and fed and watered two cats. The ALJ found that the foregoing activities were "more than minimal" and indicated that plaintiff had mental and physical stamina, and the ability to concentrate and to use her arms and legs. The ALJ specifically noted that plaintiff's ability to work with an object as small as a plant bulb suggested that her visual acuity was sufficient to avoid workplace hazards. Finally, the ALJ found plaintiff's activities outside her home, especially her frequent church attendance, inconsistent with her allegation of a disabling ability to be around other people due to depression. In the Eighth Circuit, daily activities such as those noted by the ALJ in this case have been upheld as weighing against a finding of disability. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (grocery

shopping and daily child care); <u>Lawrence v. Chater</u>, 107 F.3d 674, 676 (8th Cir. 1997) (ability to care for one's own personal needs, and ability to do some housework, cooking and shopping); <u>Nguyen v. Chater</u>, 75 F.3d 429 (8th Cir. 1996) (visiting neighbors, cooking own meals, doing own laundry and attending church); <u>Novotny</u>, 72 F.3d at 671 (carrying grocery bags, carrying out garbage); <u>Shannon v. Chater</u>, 54 F.3d 484, 487 (8th Cir. 1995) (cooking, cleaning house and performing other chores with help, visiting friends and relatives, attending church twice per month); <u>Woolf</u>, 3 F.3d at 1213 (living alone, shopping for groceries, doing housework with help).

Finally, the ALJ noted plaintiff's sporadic work history, specifically noting that plaintiff had either no earnings or minimal earnings in all but three years from 1986 until 2001, her alleged onset date. A claimant's credibility is lessened by a poor work history. See <u>Woolf</u>, 3 F.3d at 1214.

The ALJ concluded that Plaintiff's allegation of impairments producing symptoms of sufficient severity to preclude all sustained work activity was not credible. The ALJ found no credible, medically-established reason to restrict Plaintiff to anything less than light work.

A review of the ALJ's decision shows that, in a manner consistent with and as required by <u>Polaski</u>, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him, and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective

complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's credibility determination is supported by good reasons and substantial evidence on the record as a whole, this Court is required to give it deference. <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992); <u>Hogan</u>, 239 F.3d at 962.

C.   <u>Evidence Submitted to and Reviewed by the Appeals Council</u>

As noted in detail, <u>supra</u>, plaintiff submitted additional evidence to the Appeals Council along with her request for review. When new evidence is submitted to and considered by the Appeals Council, the reviewing court must then determine "whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." <u>Richmond v. Shalala</u>, 23 F.3d 1441, 1444 (8th Cir. 1994) (citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 (8th Cir. 1992)); <u>See also</u> <u>Frankl</u>, 47 F.3d at 938-39. This requires the reviewing court to engage in the "peculiar task" of essentially speculating on how the ALJ would have weighed the new evidence. <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1994).

The records from Dr. Fivian indicate that plaintiff's vision was correctable to 20/30 in each eye, that plaintiff's intraocular pressures were within normal limits, that she had minimal cataract formation, and that there was no evidence of any active diabetic retinopathy. (Tr. 188.) The records from Dr. Potts indicate that plaintiff's asthma was stabilized with Advair,

and further indicated that plaintiff required periodic follow up, on a six-month basis, for symptoms related to asthma and sinusitis. (Tr. 194, 196.) Finally, Dr. Fishman's May 27, 2005 letter indicates that plaintiff's diabetes is controlled with insulin-pump therapy. (Tr. 205.) Impairments which are controllable or amenable to treatment are incompatible with a finding of disability. <u>Johnson</u>, 240 F.3d at 1148.

Dr. Fivian did indicate that plaintiff had difficulty visualizing objects on the floor, and should therefore not work caring for small children due to the possibility she may step on a child. This is, however, consistent with the ALJ's finding that plaintiff could not perform her past relevant work, but could perform light work that did not involve good peripheral vision. (Tr. 189.) Furthermore, Dr. Fishman does indicate that the nature of plaintiff's diabetes requires her to frequently check her blood sugar levels and respond appropriately, and further indicates that, before February 2001, plaintiff had no trouble keeping a busy schedule, but was now unable to keep the same schedule or maintain the same level of activities. <u>Id.</u> Dr. Fishman does not, however, opine that plaintiff is totally disabled from all work. <u>See</u> <u>Id.</u> Again, this evidence is consistent with the ALJ's findings that plaintiff's diabetes is "severe" and that plaintiff is precluded from performing her past relevant work, but retains the ability to perform light work. <u>See</u> <u>Johnson</u>, 87 F.3d at 1017-18 ("The strongest support in the record for the ALJ's finding that [the claimant] is

not disabled is the lack of reliable medical opinions to support [his] allegations of a totally disabling condition.")

A review of the ALJ's decision, supplemented by the additional evidence submitted to the Appeals Council, reveals that the ALJ's decision is supported by substantial evidence on the record as a whole.  The additional evidence is consistent with the ALJ's findings related to plaintiff's disability status and RFC; namely, that her diabetes is controlled with insulin pump therapy, her asthma is stable and controlled with medication, her vision is correctable, and she is unable to perform her past relevant work as a child care worker or other work requiring good peripheral vision. Had the foregoing medical evidence been before the ALJ in this matter, it would not have compelled a finding of disability.

C.    Extra-Record Evidence

The undersigned finally considers plaintiff's apparent contention that remand is required per 42 U.S.C. § 405(g) for consideration of the additional medical evidence submitted for the first time via her initial brief; namely the medical records of Dr. Walentynowicz dated May 12, 2003 through July 9, 2004.  (Document No. 16-2 at pages 2-12.)  Plaintiff appears to argue that this additional evidence is "material" because it supports the conclusion that she fell and broke her ankle due to vision loss. Plaintiff further appears to attempt to establish "good cause" for her failure to present these materials at the administrative level by submitting that Dr. Walentynowicz's office had previously

refused to release these materials to her because she had yet to pay the doctor's bill in full, although she was making payments.

42 U.S.C. § 405(g) generally precludes consideration of evidence outside the record before the Commissioner during the administrative proceedings. <u>Jones</u>, 122 F.3d at 1154 (citing <u>Delrosa v. Sullivan</u>, 922 F.2d 480, 483 (8th Cir. 1991)). Remand is appropriate only upon a showing by the plaintiff "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). To be considered "material," the evidence must be "non-cumulative, relevant, and probative of the claimant's condition for the time period in which benefits were denied." <u>Jones</u>, 122 F.3d at 1154 (citing <u>Woolf</u>, 3 F.3d at 1215)). Furthermore, it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits. <u>Id.</u>

Applying this standard, the undersigned recommends a finding that plaintiff is not entitled to remand for consideration of the additional materials because they contain no opinions regarding any of the conditions plaintiff alleges are disabling. Dr. Walentynowicz's records document only plaintiff's evaluation and treatment for a broken left ankle, and left knee and shoulder pain. The application for disability benefits currently under review before this Court does not allege disability due to any left ankle, knee or shoulder condition. Plaintiff's allegation that Dr.

Walentynowicz's records support the conclusion that she fell due to poor eyesight is not compelling. While Dr. Walentynowicz's April 20, 2004 office note does document that plaintiff fell while exiting a bus, Dr. Walentynowicz offers no information whatsoever concerning what actually caused the fall. <u>See</u> (Document No. 16-2 at page 6.) Because the materials are not relevant or probative of any of plaintiff's allegedly disabling conditions for the time period for which disability benefits were denied, there is no need to discuss plaintiff's attempt to establish "good cause" for her failure to present the evidence at the administrative level.

A review of the ALJ's decision reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence on the record as a whole. The ALJ based his decision on all of the relevant, credible evidence of record. The additional materials submitted to and reviewed by the Appeals Council provide no basis for changing the ALJ's decision, and the extra-record materials submitted by plaintiff are immaterial to the conditions plaintiff alleges are disabling.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's complaint be dismissed with prejudice.

The parties are advised that they have until March 12, 2007, in which to file written objections to this Report and

Recommendation.  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir.  1990).

_____

UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of March, 2007.